UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| VEERASIKKU BOMMIASAMY, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-04001-SLD-JEH |
| | ) | |
| GALESBURG HOSPITAL CORPORATION | ) | |
| d/b/a GALESBURG COTTAGE HOSPITAL and | ) | |
| NES OKLAHOMA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

Plaintiff Veerasikku Bommiasamy alleges that Defendants NES Oklahoma, Inc. ("NES")

and Galesburg Hospital Corporation d/b/a Galesburg Cottage Hospital ("GCH") discriminated

against him on the basis of national origin and age, in violation of Title VII, 42 U.S.C. §§ 2000e–

2000e-17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.

Before the Court are NES's Combined Motion and Memorandum of Law in Support of

Summary Judgment ("NES Motion for Summary Judgment"), ECF No. 35, GCH's Motion for

Summary Judgment, ECF No. 36, and Plaintiff's Motion to Strike Opinions and Hearsay in

Declaration of Steven Wexler, M.D. and All References Thereto in NES Oklahoma, Inc.'s

Summary Judgment Papers, and for the Imposition of Rule 37(c)(1) Sanctions ("Motion to Strike

Wexler Declaration"), ECF No. 41.  For the reasons that follow, the summary judgment motions

are GRANTED, and Plaintiff's motion to strike is DENIED.

# BACKGROUND[1]

Plaintiff was an emergency-room physician and began practicing medicine in GCH's Emergency Department ("ED") in 2007.  On November 30, 2017, GCH entered into a contract with NES—the Staffing Agreement—whereby NES would provide GCH with independent-contractor physicians to work within GCH's ED.  That same day, Plaintiff signed a contract—Plaintiff's Physician Agreement—with NES to continue providing his services in GCH's ED.[2] Plaintiff's Physician Agreement provided for a one-year term, which would renew automatically upon each expiration of such term.  The impetus for this case was Plaintiff's permanent removal from the GCH ED schedule and the termination of his Physician Agreement with NES, which Plaintiff argues was the result of unlawful discrimination on the basis of national origin and age. The parties tell conflicting stories about when and why Plaintiff was terminated, as well as whether the reasons given for his termination were honest.

The parties at least agree on the identities of the relevant actors to this case.  On the NES side during the relevant time periods, Heather Mott was Account Manager, Dr. Thomas Singel was Site Medical Director for the GCH ED, Dr. Steve Wexler was Chief Medical Officer and Regional Medical Director, Thomas Brown was Regional Vice President, and Doris Kirkland

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, this factual background is drawn from the statements of undisputed material facts in the summary judgment motions, *see* NES Mot. Summ. J. 5–28; GCH Mot. Summ. J. 3–14, Plaintiff's responses to those statements of undisputed material facts, *see* Resp. GCH Mot. Summ. J. 2–18, ECF No. 66; Resp. NES Mot. Summ. J. 2–53, ECF No. 67, Plaintiff's identical statements of additional material facts offered in response to each motion, *see, e.g.*, Resp. NES Mot. Summ. J. 53–94, the replies thereto, *see* GCH Reply Mot. Summ. J. 2–276, ECF No. 70; NES Reply Mot. Summ. J. 1–144, ECF No. 71, and exhibits attached to those filings.

[2] The counterparty to Plaintiff's Physician Agreement was NES, *see* Pl.'s Physician Agreement, NES Mot. Summ. J. Ex. 4, ECF No. 35-5, whereas the counterparty to the Staffing Agreement was NES Michigan, Inc, *see* Staffing Agreement, GCH Mot. Summ. J. Ex. 2, ECF No. 36-2.  Thomas Brown, a signatory to Plaintiff's Physician Agreement, *see* Pl.'s Physician Agreement 6, and a regional vice president of operations for NES during the relevant time periods, *see* Brown Dep. 8:21–10:21, NES Mot. Summ. J. Ex. 18, ECF No. 35-19, testified in his deposition that the counterparty to Plaintiff's Physician Agreement should have been NES Michigan, Inc, *see id.* at 78:8–17. No parties make any arguments which render this mistake material.  The Court's use of NES refers interchangeably to NES Michigan, Inc or NES Oklahoma, Inc., as appropriate.

was a recruiter working to place physicians at GCH, though she stopped working on tasks related to GCH around March 2018.  On the GCH side, Cassie Cirimotich was Chief Quality Officer, Pam Davis was Chief Nursing Officer, Dr. Frank Peppers was Chief of Staff, and James Flynn was Chief Executive Officer.

## I.    Dr. Singel's Role

The parties vigorously dispute the role that Dr. Singel played in Plaintiff's ultimate termination.  Plaintiff described many instances of Dr. Singel making harmful comments towards him and mistreating him.  On multiple occasions, Dr. Singel: (1) told Plaintiff that he looked and was dirty; (2) asked Plaintiff how many wives he had and made references to harems; (3) told Plaintiff that his vegetarian food smelled bad; (4) told Plaintiff that he was too old and that he should not work so many hours at his age; (5) confronted Plaintiff and stood in a threatening and close posture, pointing his finger in Plaintiff's face; and (6) threw Plaintiff's food away.  Plaintiff also stated that Dr. Singel said to him that the doctors' breakroom was not a place for him, that he should not eat in the doctors' breakroom nor wash his plates in that room, and that he made too much money.[3]  Plaintiff testified that when he confronted Dr. Singel about this pattern of behavior, Dr. Singel threatened to cut his shifts and to put him on night shifts.  Plaintiff also testified that Dr. Singel's harassment began in February or March of 2018, but that he stopped eating in the breakroom in May or June 2018, and that Dr. Singel stopped making these harmful comments in July 2018 or earlier.  Plaintiff noted that most of the time their schedules did not overlap, such that they did not interact.  Dr. Singel testified that he recommended that Plaintiff

---

[3] Plaintiff also asserts that Dr. Singel told others that "if he tells [Plaintiff] to sit, [Plaintiff] will sit, and if he says [Plaintiff] should stand, [Plaintiff] will stand." Pl. Decl. ¶ 46k, Resp. NES Mot. Summ. J. Ex. A, ECF No. 67-1 at 1–36.  In his deposition, Plaintiff testified that others told him that Dr. Singel said this—not that he personally witnessed Dr. Singel making these remarks.  Pl. Dep. 53:12–19, NES Mot. Summ. J. Ex. 2, ECF No. 35-3.  This is hearsay and therefore not admissible.

be terminated, and that he "probably" told Brown and Dr. Wexler of his opinion. Singel Dep. 63:12–22, Resp. NES Mot. Summ. J. Ex. M, ECF No. 67-13.

## II.    The Meetings

The parties agree that three meetings—September 23, October 23, and November 16 of 2018—were critical to the decision to terminate Plaintiff. Brown took handwritten notes during these meetings, which he later typed up. Brown testified that he "put everything on one document," including the email from Cirimotich, "to send over to . . . [NES's] attorney to show him everything [he] had." Brown Dep. 83:6–9, NES Mot. Summ. J. Ex. 18, ECF No. 35-19.

On September 23, 2018, Brown, Dr. Wexler, Flynn, and Davis met to discuss issues related to Plaintiff. Flynn had called Brown to set up a meeting to discuss terminating Plaintiff. Flynn and Davis "questioned [Plaintiff's] effectiveness" and noted that he "had become increasingly slow, needed help using the EMR system and [was] generally difficult to deal with." Brown's Notes 5, NES Mot. Summ. J. Ex. 19, ECF No. 35-20. Flynn and Davis also questioned his "medical judgment"—Brown circled this phrase and wrote and underlined the word "wow" next to it. *Id.* at 2. Dr. Wexler asked if there were clinical concerns related to Plaintiff, and Davis responded that those would be investigated. Flynn wanted Plaintiff to be treated with respect. The GCH side wanted the decision to remove Plaintiff to come from NES, but the NES side explained that Plaintiff's Physician Agreement allowed GCH to request his removal from the GCH ED schedule. Specifically, they discussed how both NES and Plaintiff were empowered to terminate Plaintiff's Physician Agreement upon ninety-days' notice, but NES could circumvent this ninety-day period and terminate Plaintiff's Physician Agreement immediately if NES was "notified either orally or in writing by an administrative employee or by a licensed physician at a medical institution in which the Physician [wa]s providing medical

4

services pursuant to [Plaintiff's Physician Agreement] that the service of the Physician [wa]s unsatisfactory to the medical institution." Pl.'s Physician Agreement ¶ 1, NES Mot. Summ. J. Ex. 4, ECF No. 35-5; *see also* Brown Dep. 96:6–9 (testifying that he read this language from Plaintiff's Physician Agreement in this meeting). They agreed to a follow-up meeting. Brown made a note to talk to Dr. Wexler after the call and wrote the word "Crazy!!" next to that note. Brown's Notes 2.

On October 23, Brown, Dr. Wexler, Flynn, Davis, and Cirimotich met to discuss issues related to Plaintiff. They discussed the language in Plaintiff's Physician Agreement and the Staffing Agreement concerning the removal of providers. Cirimotich discussed clinical concerns that she had regarding Plaintiff, which Wexler requested that she put in writing. Flynn reiterated that Plaintiff was to be treated with respect. Again, Brown wrote and underlined the word "crazy." *Id.* at 3. Dr. Wexler asked about timeline, and Davis said that Plaintiff should be removed quickly and that it should not drag out past the end of the year. Flynn stated that he wanted to review the relevant contract language and that he would provide a letter requesting that Plaintiff be removed from the GCH ED schedule.

On November 16, Brown, Dr. Wexler, Flynn, Davis, and Cirimotich met a final time. Flynn stated that he agreed with the contract language and would be providing NES with a letter requesting that Plaintiff be permanently removed from the GCH ED schedule. Flynn reiterated the need to treat Plaintiff with respect. The attendees discussed the language that would be used in the letter requesting his removal. Brown stated that he would wait to receive the official request in writing from GCH before removing Plaintiff. Flynn sent the letter to Brown on November 20, which stated that Flynn understood that NES's "agreement with the providers allows removing [a provider] from the schedule if there are concerns by the facility and if

requested by the facility," and asked that Brown "accept this communication as a request to remove [Plaintiff] from the staffing schedule of [his] Emergency Department."  Nov. 20, 2018 Letter from James Flynn to Thomas Brown ("November 20 Letter"), NES Mot. Summ. J. Ex. 26, ECF No. 35-27.  In a subsequent letter to Plaintiff informing him that NES was concluding its relationship with him, Brown stated that "[a] number of performance related issues and scheduling challenges have led to [GCH] requesting you be removed from the schedule effective December 31, 2018."  Dec. 18, 2018 Letter from Thomas Brown to Veerasikku Bommiasamy ("December 18 Letter"), NES Mot. Summ. J. Ex. 27, ECF No. 35-28.

## III.   Scheduling Concerns

The termination letter from NES cited scheduling concerns as a reason for Plaintiff's termination.  *See id.*  The physician schedules for the GCH ED had two shifts—a day shift of 7:00 a.m. to 7:00 p.m., and a night shift of 7:00 p.m. to 7:00 a.m.  Schedules for the GCH ED were made by NES and provided to physicians 60 to 90 days in advance.  Physicians could swap shifts amongst themselves.  After the Staffing Agreement between NES and GCH was in place, the schedules were initially created by Kirkland, but the last schedule she created was for March 2018, at which point Mott made the schedules.  Mott described her process for making schedules as first soliciting availability from physicians, then inserting Dr. Singel into the schedule due to his administrative responsibilities and contractual full-time status, then inserting other physicians with "an express contractual obligation to work a 'full-time' number of shifts," into the schedule, and finally inserting part-time physicians into the schedule.  Mott Decl. ¶ 17–20, NES Mot. Summ. J. Ex. 5, ECF No. 35-6.  Plaintiff's Physician Agreement did not specify whether he was full-time or part-time.[4]  In 2018, Plaintiff was unavailable at least from May 25 to June 8,

---

[4] Plaintiff cites an email from Kirkland describing Plaintiff as "our full timer."  *See* Nov. 30, 2017 Email from Doris Kirkland to Veerasikku Bommiasamy, Resp. NES Mot. Summ. J. Ex. E, ECF No. 67-5.  The copy of this email that

November 12 to November 16, November 25 to November 30, and December 1 to December 14.[5]  However, Plaintiff was frequently willing to cover shifts for other physicians, as well as to work holidays and weekends.

Plaintiff had requested that NES schedule him only for day shifts in blocks of four to five shifts at a time—totaling approximately twelve shifts per month—because he did not drive and commuted "300 miles round trip" to work his shifts at GCH.  Mar. 30, 2018 Email from Veerasikku Bommiasamy to Heather Mott, NES Mot. Summ. J. Ex. 11, ECF No. 35-12.  In contemporaneous statements about the GCH ED schedules, Plaintiff stated that he had a verbal agreement that he would only be scheduled for day shifts.  *See* Mar. 26, 2018 Email from Veerasikku Bommiasamy to Heather Mott, NES Mot. Summ. J. Ex. 9, ECF No. 35-10 ("As we discussed in the past with Doris and Tom ( because of my age 71 years), we all agreed that I'll be given only day shifts .").  Mott avers that she was unaware of any such agreement.  Plaintiff was scheduled to work five-hour portions of the night shifts for April 5 and April 6 of 2018— otherwise, Plaintiff did not work night shifts.  Plaintiff received notice of his finalized schedules for November 2018 and December 2018 by November 5, 2018, and by November 15, 2018, he had notice that he had been removed from all of his shifts in January 2019.

The parties dispute the extent to which Dr. Singel was also involved in creating the schedules.  According to NES, Dr. Singel was not involved in making the schedules—only Mott

---

Plaintiff attached to his filing was printed on May 26, 2023.  *See id.*  Discovery in this case closed on March 31, 2023.  *See* Oct. 5, 2022 Text Order.  Both NES and GCH state that this email was not produced in discovery and argue that it should be disregarded.  *See, e.g.*, GCH Reply Mot. Summ. J. 121; NES Reply Mot. Summ. J. 48.  A party may not rely on information which was not properly produced to supply evidence on a motion unless such "failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Plaintiff offers no explanation for why this email was not produced before the close of discovery, so the Court does not consider it.

[5] Plaintiff again relies on previously undisclosed text messages to support that he cancelled his scheduled trip from May 25 to June 8 and informed Mott that he was newly available on those dates on April 27.  *See* Text Messages from Veerasikku Bommiasamy to Heather Mott, Resp. NES Mot. Summ. J. Ex. F, ECF No. 67-6; GCH Reply Mot. Summ. J. 125; NES Reply Mot. Summ. J. 54.  The Court does not consider these untimely text messages.

or Kirkland made them.  *See, e.g.*, Mott Decl. ¶ 7 ("I do not recall Dr. Singel having any role in actually making the GCH ED physician schedules in May 2018 through January 2019.  I made those schedules.").  Conversely, GCH represented to the Equal Employment Opportunity Commission ("EEOC") that "Dr. Singel was . . . the individual responsible for coordinating [Plaintiff]'s shifts in the [ED]."  Dec. 6, 2019 Letter from Rachel Wright to Julie Bretz, US EEOC 2, Resp. NES Mot. Summ. J. Ex. I, ECF No. 67-9 at 2–3.  Plaintiff highlights that Dr. Singel's Physician Agreement made him responsible "responsible for administering overall performance of the Company."[6]  Resp. NES Mot. Summ. J. 16, ECF No. 67 (quoting Singel Physician Agreement 9, NES Mot. Summ. J. Ex. 12, ECF No. 35-13).  In response to Plaintiff's complaints about being scheduled for the night shifts on April 5 and 6, Mott stated that she talked with Dr. Singel about that schedule.  *See* Mar. 27, 2018 Email from Heather Mott to Veerasikku Bommiasamy, NES Mot. Summ. J. Ex. 9, ECF No. 35-10 ("I have talked with Dr. Singel, and I will certainly try to find alternate coverage for those two evenings, but worst case, we will need you to work them.").  Davis also testified that she "believe[d] Dr. Singel was in charge of the schedule."  Davis Dep. 95:16–18, NES Mot. Summ. J. Ex. 22, ECF No. 35-23.

## IV.   Performance Concerns

Neither the November 20 Letter nor the December 18 Letter are specific about the performance concerns upon which Plaintiff's ultimate termination was based.  According to Brown's notes from the September 23, 2018 meeting where Plaintiff's termination was first discussed, Davis and Flynn identified Plaintiff's clinical judgment, effectiveness, and ability to use the EMR system.  Brown's notes from the second meeting on October 23 indicate that Cirimotich had clinical concerns as well but do not substantiate what those concerns were.  Other

---

[6] Dr. Singel's Physician Agreement does not define "Company," but does define "Corporation" as "NES Medical Services of Michigan."  Singel Physician Agreement 9.

evidence sheds light on the various clinical concerns that were contemporaneously identified. Dr. Wexler's declaration highlights five things in particular: (1) the endotracheal ("ET") tube incident; (2) the stress test incident; (3) the first code situation (referring to a situation where a patient is near death); (4) the second code situation; and (5) the EMR system issues.

The ET tube incident was documented in an email from Dr. Singel written on October 24, 2018—a day after the second meeting where Plaintiff's termination was discussed. *See* Oct. 24, 2018 Email from Thomas Singel to Veerasikku Bommiasamy, NES Mot. Summ. J. Ex. 23, ECF No. 35-24. Dr. Singel's email was addressed to Plaintiff, Dr. Wexler, and Brown, and it informed Plaintiff that Dr. Singel had been informed by "[n]ursing administration" that Plaintiff "admitted a patient to the floor, at the end of life, with comfort measures only," and that "[t]he problem was that [Plaintiff] left the [ET] tube in the patient, after disconnecting the ventilator." *Id.* Dr. Wexler avers that, in his opinion, "[l]eaving an ET tube in a patient after the ventilator is discontinued is inexplicable and inexcusable," and was "an act of egregious incompetence." Wexler Decl. ¶ 13, NES Mot. Summ. J. Ex. 20, ECF No. 35-21. Cirimotich described this incident as "significant" and "traumatizing for the [patient's] family." Cirimotich Dep. 74:12–21, NES Mot. Summ. J. Ex. 21, ECF No. 35-22.

The stress test incident was described in that same October 24, 2018, email, and Dr. Singel noted that "[c]ardiac rehab complained that [Plaintiff] scheduled a stress test on a patient that could not ambulate well enough to come close to completing it." Oct. 24, 2018 Email from Thomas Singel to Veerasikku Bommiasamy. Dr. Wexler avers that he "considered [Plaintiff's] decision to give a treadmill stress test to a patient who could not complete the test a signal that [Plaintiff] lacked the ability to understand and comprehend the situation at hand—which was

unacceptable for an ED physician."  Wexler Decl. ¶ 14.  Cirimotich described the stress test incident as "not a significant issue."  Cirimotich Dep. 73:23–74:11.

The two code incidents were identified in an email from Cirimotich, sent on October 31, 2018, one week after the second meeting in which Dr. Wexler asked her to document her clinical concerns.  In the first code situation, Cirimotich observed an "overall lack of leadership by [Plaintiff]," specifically noting that: (1) the patient was not sedated before being intubated; (2) a "shockable rhythm" was not being addressed in a timely manner and when this was brought to Plaintiff's attention he told staff to "give him a few minutes to figure it out;" (3) and Plaintiff had to redraw the patient's blood because he did not utilize heparinized tubes.  Oct. 31, 2018 Email from Cassie Cirimotich to Thomas Brown, NES Mot. Summ. J. Ex. 25, ECF No. 35-26.  Dr. Wexler avers that he thought Plaintiff's "response to the first code situation was extremely troubling," and that Plaintiff's "need for a few minutes to figure out a situation in which a patient's death was imminent [was] appalling."  Wexler Decl. ¶ 17.

In the second code situation, Cirimotich observed Plaintiff "not giving clear direction to staff, mumbling to himself, pacing, and staff having to interrupt him to clarify orders and dosages," as well as "leav[ing] the room twice."  *Id.*  Dr. Wexler avers that he thought that Plaintiff's "actions of leaving the room twice while a patient was dying, and failing to provide clear direction to the ED team, were inexcusable."  Wexler Decl. ¶ 18.  Again, Cirimotich thought this incident demonstrated insufficient leadership by Plaintiff.  Cirimotich Dep. 46:1–20.  Cirimotich testified that she thought that these code issues were "very, very concerning incidents," and would "be a reason to not have a provider."  *Id.* at 130:20–24.

As to the EMR issues, Cirimotich also recalled Plaintiff having "great difficulty" with that system.  *Id.* at 135:12–14.  When asked for the reasons "that anyone gave for removing

[Plaintiff] from the schedule" in her deposition, Davis pointed to the EMR system.  Davis Dep. 91:12–22 ("[Plaintiff] struggled with the electronic health record and with, you know, fluidity with that without assistance and so that's what bubbled up to me because the nursing staff were the ones that would have to do that assistance and it pulled them out of their job duties.").

Cirimotich recalled other complaints about Plaintiff's clinical performance.  She testified that patients complained about how Plaintiff treated pain, specifically that "he had the most complaints about not treating pain[,] more than any other physician in the [ED]."  Cirimotich Dep. 34:21–36:23.  She also pointed to complaints from other physicians about Plaintiff's communications about their patients whom he treated, such as "transfer[ring] the patient to Peoria 45 minutes away without consulting their primary care provider or their specialist here."  *Id.* at 39:18–40:9.  She also testified that Plaintiff would walk "around the block" on breaks during his shifts in the ED without a pager and that it was difficult to explain to Plaintiff the importance of properly documenting certain quality measures which were reported to government entities.  *Id.* at 54:4–21.

Other documentary evidence captured some potential concerns related to Plaintiff's performance.  GCH was subject to certain federal standards and requirements, including the standards imposed by the Center for Medicare and Medicaid Services ("CMS").  Variances from those standards could arise from improper care or a physician's failure to properly document care.  Administrative employees of GCH would review patients' medical charts to determine whether the charts contained any variances from statistical and other standards set by CMS. Deviations from those standards were discussed with physicians.  For example, Cheryl Hanson, an administrative employee of GCH reporting to Cirimotich, informed Plaintiff that "[a] variance occurred when fluid resuscitation was not given to the target volume of 2,041 ml. based on body

weight" in one of his sepsis cases.  Dec. 17, 2018 Letter from Cheryl Hanson to Veerasikku
Bommiasamy, NES Mot. Summ. J. Ex. 30, ECF No. 35-31.

GCH had a peer-review process, wherein physicians would be asked to review the care
that another physician provided considering the applicable CMS standards and to conclude
whether they agreed with the care provided by that physician.  A peer review committee, such as
the Medical Care Review Committee, would assign a score from 1 to 5, with a score of 3
denoting "treatment inappropriate, but adverse impact on the patient was minor or minimal,
temporary or permanent harm."  *See, e.g.*, Dec. 17, 2018 Letter from Cassie Ciromitich to
Veerasikku Bommiasamy, NES Mot. Summ. J. Ex. 29, ECF No. 35-30.  Variances were not
always peer reviewed.  Dr. Singel was on the Medical Care Review Committee.  There is no
evidence that the two code situations, ET tube incident, and stress test incident described above
were referred for peer review.

However, at least one incident involving Plaintiff was referred for peer review.  *See* GCH
Interrog. Resp. 7–10, GCH Mot. Summ. J. Ex. 1, ECF No. 36-1 (describing Quality
Improvement Medical Staff Peer review forms for Plaintiff for 2017 and 2018).  Medical record
number 424-051 was potentially a ST-elevation myocardial infarction ("STEMI") case, meaning
an indication of a type of heart attack.  Jenna Johnson, GCH's chest pain coordinator within
GCH's quality department who reported to Cirimotich, referred the case to peer review.
Cirimotich testified that the patient's chart indicated "a pretty big delay in . . . care and
treatment."  Cirimotich Dep. 81:13–21.  The peer review focused on "the EKG, [Plaintiff's]
interpretation and that a 'Stemi alert' was not called and that patient was not transferred within
the 60 minutes timeframe."  Oct. 24, 2018 Email from Cassie Cirimotich to Veerasikku

Bommiasamy, NES Mot. Summ. J. Ex. 28, ECF No. 35-29.  The peer review resulted in a score of 3 and the case was referred to GCH's Medical Care Review Committee.

Before the Medical Care Review Committee met to discuss the STEMI case, Plaintiff sent a letter to Cirimotich expressing concern that Dr. Singel would be on that committee because Plaintiff "had some ongoing disputes with Dr. Singel regarding [his] scheduling and contract rights with NES" and Dr. Singel had "displayed some personal animus toward [him] on a number of issues which [he did not] believe [were] pertinent to medical staff review of th[e] matter."  Nov. 2, 2018 Letter from Veerasikku Bommiasamy to Cassie Cirimotich, Resp. NES Mot. Summ. J. Ex. Q, ECF No. 67-17.  Cirimotich testified that she was not concerned about Dr. Singel's presence on the committee because he would be only one of six to eight members of the committee and would not chair the committee.  The Medical Care Review Committee recommended that Plaintiff's "next five (5) cardiac cases be peer reviewed with focus on appropriate care, treatment, and documentation."  Dec. 17, 2018 Letter from Cassie Cirimotich to Veerasikku Bommiasamy.

## V.    **Reasons for Plaintiff's Termination**

Different sides tell differing stories about the exact reasons for Plaintiff's termination— scheduling, performance, or both.  NES personnel focus on the performance issues.  Brown's notes on the three meetings do not make any mention of scheduling difficulties.  Instead, the notes describe Plaintiff's issues using the EMR system, his medical judgment, that Plaintiff "was generally difficult to deal with," and other clinical concerns which Dr. Wexler requested that Cirimotich put in writing.  Brown's Notes 5.  Dr. Wexler avers that Plaintiff "had been with the hospital for many years and was well-liked, but the nurses and quality employees knew that [he] was not a high-quality physician," and that nurses had "to cover for [him] in critical cases."

Wexler Decl. ¶ 8.  Dr. Wexler's "impression was that GCH management knew that [Plaintiff] was not qualified to work in the GCH ED, but management hoped he would decide that for himself so that the hospital would not have to take action to remove [him]."  *Id.*

Dr. Wexler also avers that he thought that "Flynn, Davis, and Cirimotich wanted [Plaintiff] removed from the GCH ED schedule for performance reasons," because those "performance deficiencies were being discussed at and around the time Davis said [in the second meeting on October 23, 2018] that [Plaintiff] should be removed from the schedule by the end of the year 2018."  *Id.* ¶ 20; *see also id.* ("I had every reason to believe that GCH wanted [Plaintiff] removed from the GCH ED schedule for those performance reasons.").  Similarly, Brown avers that he "believed that GCH wanted NES to remove [Plaintiff] from the GCH ED schedule because of his performance deficiencies—and [he] believed that to be Flynn's motivation for sending the [November 20 L]etter asking for [Plaintiff]'s removal."  Brown Decl. ¶ 17, NES Mot. Summ. J. Ex. 8, ECF No. 35-9.  They both aver that GCH started the discussions that led to Plaintiff's termination, and that they had to accept GCH's decision to permanently remove him from the GCH ED schedule.  *See, e.g.*, Wexler Decl. ¶¶ 7, 22 ("[A]s a practical business matter, NES has to honor a hospital's request to remove a physician from the hospital.").  They also discuss scheduling issues in their declarations, but Dr. Wexler makes "clear[ that Plaintiff]'s performance deficiencies were, on their own, sufficient reason to terminate his Physician Agreement with NES."  *Id.* ¶ 27.

Conversely, GCH focuses on the schedule.  Flynn testified that the November 20 Letter was "written to NES to remove [Plaintiff] from the schedule. . . because [Plaintiff] couldn't work the schedule that [NES] needed."  Flynn Dep. 19:3–6, NES Mot. Summ. J. Ex. 24, ECF No. 35-25.  Before the EEOC, GCH stated that it asked NES to stop scheduling Plaintiff in GCH's ED

because of GCH's "legitimate concerns over physician productivity and patient safety caused by [Plaintiff]'s scheduling demands."  Dec. 6, 2019 Letter from Rachel Wright to Julie Bretz, US EEOC 2.  That letter also claimed that "[o]nce [Plaintiff]'s assignment [via NES] at [GCH] started, it quickly became apparent that his scheduling demands were a bad fit for the [ED]," and that the GCH ED "had a longstanding practice for daytime providers to work no more than three consecutive 12-hour shifts."  *Id.*  GCH also denied that it decided to terminate Plaintiff's Physician Agreement because it did not "have that authority."  *Id.*

## VI.    Procedural History

On September 12, 2019, Plaintiff filed administrative charges against both NES and GCH, alleging they discriminated against him on the basis of age and national origin.  He filed his complaint on January 4, 2021.  *See generally* Compl., ECF No. 1.  He alleges that NES and GCH discriminated against him by subjecting him to harassment, reducing his shifts, and terminating him.  *See, e.g.*, *id.* ¶¶ 17–19.  NES moves for summary judgment on all of Plaintiff's claims against it, arguing that nearly all of Plaintiff's claims are time-barred[7] and there were legitimate, non-discriminatory reasons for all the alleged adverse actions.  NES Mot. Summ. J. 3–5.  GCH also moves for summary judgment on all claims against it, arguing that there were legitimate non-discriminatory reasons for all of its decisions.[8]  GCH Mot. Summ. J. 2.  GCH

---

[7] NES also argues that "to the extent Plaintiff's Complaint is construed to include claims of unlawful retaliation, such claims fail because Plaintiff failed to exhaust administrative remedies by including allegations of retaliation within the scope of a timely-filed [administrative] charge."  NES Mot. Summ. J. 5.  During his deposition, Plaintiff testified that he believed Defendants retaliated against him and his counsel indicated an intention to amend the complaint to include a retaliation claim.  Pl. Dep. 24:23–26:15.  But Plaintiff never amended his complaint to include a retaliation claim.  And he admits that he "does not allege a retaliation claim in the Complaint . . . [so] no such claim is before this Court."  Resp. GCH Mot. Summ. J. 8, ECF No. 66.

[8] GCH also argues that Plaintiff was an independent contractor, not its employee.  GCH Mot. Summ. J. 2.  To maintain an action under either the ADEA or Title VII, a plaintiff must point to the existence of an employment relationship between himself and the defendant—status as an independent contractor is insufficient.  *See Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991) (Title VII); *Hayden v. La-Z-Boy Chair Co.*, 9 F.3d 617, 619 (7th Cir. 1993) (ADEA).  The Court need not resolve this dispute as it finds that summary judgment in favor of GCH is appropriate on other grounds, so it assumes for purposes of this order that Plaintiff was an employee of GCH.

joined in NES's arguments that Plaintiff's claims are time-barred.  Joinder 1, ECF No. 37.

Plaintiff moves to strike parts of a declaration NES submitted in support of its summary

judgment motion.  *See generally* Mot. Strike Wexler Decl.

## DISCUSSION

### I. Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  To preclude summary judgment, the nonmovant must "make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court

must construe the record in the light most favorable to the nonmovant, *Payne v. Pauley*, 337 F.3d

767, 770 (7th Cir. 2003), "resolving all factual disputes and drawing all reasonable inferences in

favor of [the nonmovant]," *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017).  The

nonmovant "is not entitled to the benefit of inferences that are supported by only speculation or

conjecture." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)

(quotation marks omitted).  "[T]he mere existence of *some* alleged factual dispute is insufficient

to defeat a motion for summary judgment," *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015)

(quotation marks omitted), as "there must be evidence on which the jury could reasonably find

for the [nonmovant]," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### II. Analysis

#### A. Motion to Strike

Plaintiff argues that the Court should strike Dr. Wexler's declaration.  *See generally* Mot.

Strike Wexler Decl.  Dr. Wexler's declaration contains his opinions as NES's Chief Medical

Officer and Regional Medical Director about the various concerns about Plaintiff's job performance, *see* Wexler Decl. ¶¶ 2, 12–14, 17–18, 23, as well as his legal understanding of the contract between NES and GCH, *see id.* ¶¶ 10, 22.  Plaintiff argues that these portions of Dr. Wexler's declaration constitute expert opinion testimony, which must be stricken because (1) NES did not disclose Dr. Wexler as an expert witness and failed to comply with the Federal Rules of Civil Procedure concerning expert witnesses, Mot. Strike Wexler Decl. 4–6; (2) Dr. Wexler's declaration lacks sufficient foundation and is based on inadmissible hearsay, not personal knowledge, *id.* at 6–10, 11–12; and (3) Dr. Wexler's purported legal opinions "lack any disclosure, lack any support from the declarant's experience or education, and lack any fact basis," *id.* at 9.

NES counters that Dr. Wexler's declaration is "is directed at the reasons why he found Plaintiff's performance unacceptable—not issues of medical causation or prognosis or even failure to meet an objective professional standard," and therefore does not constitute expert testimony.  NES Resp. Mot. Strike Wexler Decl. 5–7, ECF No. 47.  Further, NES argues that Dr. Wexler's declaration does not suffer from any foundation or hearsay issues because the statements are not offered to prove the truth of the matters asserted and were based on personal knowledge he gained as a decisionmaker for NES.  *Id.* at 7–12.  Finally, NES maintains that Dr. Wexler's testimony about the contract between NES and GCH does not relate to any ultimate legal conclusion regarding contract issues like the materiality of a breach, but instead his admissible understanding of the contract while participating in employment decisions as a decisionmaker for NES.  *Id.* at 12–13.

The employment-law context of the instant case is critical as it informs the purpose for which Dr. Wexler's testimony is offered.  Plaintiff cites two cases to support his position that Dr.

Wexler's declaration contains expert testimony, and both cases are 42 U.S.C. § 1983 cases analyzing testimony from doctors concerning the effect of gunshot wounds and the use of a Taser respectively. *See* Mot. Strike Wexler Decl. 5 (citing *Banister v. Burton*, 636 F.3d 828, 832 (7th Cir. 2011) (gunshot), *and Moriconi v. Koester*, No. 11-cv-3022, 2014 WL 3704797, at *3 (C.D. Ill. July 25, 2014) (Taser)). However, Dr. Wexler's testimony is not being offered to resolve questions of medical causation or any other material issue which would require expert qualification. Instead, his testimony is offered to show what he believed at the time the decision to terminate Plaintiff was made. *See Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021) ("The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest*." (alteration in original) (quotation marks omitted)).

For example, Dr. Wexler describes Plaintiff's failure to remove the ET tube from a patient after taking that patient off a ventilator as an "act of torture." Wexler Decl. ¶ 13. Plaintiff describes this characterization as "inflammatory and bizarre," and argues that his decision to not remove the ET tube was "a commonplace event in medical practice which medical literature supports as appropriate patient care." Mot. Strike Wexler Decl. 8, 10. Plaintiff's argument misses the mark—Dr. Wexler's testimony is not offered to establish whether Plaintiff's actions were appropriate patient care, but rather to establish what Wexler thought of Plaintiff's actions as a decisionmaker. *See* Wexler Decl. ¶ 13 ("In my opinion, that single incident, by itself, justified the removal of [Plaintiff] from the GCH ED schedule and the termination of his contract with NES. . . . Learning that [Plaintiff] did that to a patient made me upset."). Dr. Wexler did not need to be qualified as an expert to provide testimony concerning his contemporaneous beliefs, such that Plaintiff's argument that Dr. Wexler based his testimony

on "extremely insufficient facts or data" is irrelevant.  *See* Mot. Strike Wexler Decl. 7 (citing

Fed. R. Evid. 702 (requiring that expert testimony be "based on sufficient facts or data")).[9]

Dr. Wexler's declaration has a sufficient foundation.  It is derived from his

"participat[ion] in discussions that ultimately led to the removal of [Plaintiff] from the ED

schedule at GCH and the termination of his independent contractor Physician Agreement with

NES," as well as his seven years of experience with NES.  Wexler Decl. ¶¶ 2, 6.  Dr. Wexler did

not need to be present for the incidents which allegedly led to Plaintiff's termination to reach an

employment decision based on those incidents, and he could rely on reports from others to form

an understanding or impression of Plaintiff's conduct.  *See Uhlir v. City of Wheaton*, No. 18 C

3215, 2019 WL 6827642, at *6 (N.D. Ill. Dec. 9, 2019) ("[E]mployers are not required to base

employment decisions on evidence that would satisfy the Federal Rules of Evidence."); *Krnich v.

FPC Corp.*, No. 19-cv-5358, 2021 WL 3930306, at *3 (N.D. Ill. Sept. 2, 2021) ("Employment

can provide the foundation for facts and perceptions relating to that employment.").

Nor does Dr. Wexler's declaration suffer from hearsay issues.  As a fact witness, "[Dr.

Wexler] [can] testify about his state of mind, including his motivations for his decisions."  *See

Krnich*, 2021 WL 3930306, at *4; *see also Khungar*, 985 F.3d at 575 ("The complaints here are

not hearsay because they are not offered to show that [the employee] in fact engaged in the

conduct complained of, but to show [the decisionmaker]'s state of mind when he made his

recommendation." (quotation marks omitted)); *Noone v. Presence Hosps. PRV*, 149 F. Supp. 3d

904, 909 (N.D. Ill. 2015) (collecting cases concerning the use of evidence for the non-hearsay

---

[9] Plaintiff's arguments concerning the insufficiency of Dr. Wexler's investigation of this incident and other concerns raised about Plaintiff go to the merits of his discrimination claim—specifically whether Defendants' proffered reasons for Plaintiff's termination were pretextual—and the probative value of Wexler's declaration, not its admissibility or character as expert testimony.  *Cf. Khungar*, 985 F.3d at 576 (discussing the sufficiency of an employer's investigation into complaints about an employee in the context of pretext).

purpose of showing a statement's effect on a decisionmaker).  Plaintiff's arguments that Dr.
Wexler's declaration misstates the exact details of the ET tube incident, stress test incident, and
two code situations, *see* Mot. Strike Wexler Decl. 9, address the probative value of Wexler's
declaration, not its admissibility or character as expert testimony.

Finally, Dr. Wexler's testimony about his understanding of the contract between NES and
GCH does not constitute an impermissible legal opinion.  That testimony instead relates to his
belief about the options NES had under the contract, a belief which was formed—either correctly
or incorrectly—in the course of his employment with NES.  *Cf. United States v. Agee*, No. 1:19-
cr-00103-TWP-DLP, 2021 WL 2894784, at *2 (S.D. Ind. July 9, 2021) (allowing lay opinion
testimony from "four [Small Business Administration ("SBA")] employees . . . about the rules,
regulations, and standard operating procedures governing the SBA programs" because "the SBA
witnesses acquired their knowledge of SBA rules and practices during the course of their
employment with the SBA, and their testimony will be limited to their personal knowledge of
SBA rules and practices").  In sum, Dr. Wexler's declaration is not expert testimony or otherwise
inadmissible, and Plaintiff's motion to strike is DENIED.[10]

### B.  Administrative Exhaustion

For non-federal employees,[11] a prerequisite to commencing a suit under either the ADEA
or Title VII is filing "a charge with the EEOC or equivalent state agency."  *See Wrolstad v. Cuna
Mut. Ins. Soc'y*, 911 F.3d 450, 456 (7th Cir. 2018) (ADEA); *Begolli v. Home Depot U.S.A., Inc.*,

---

[10] Plaintiff additionally seeks to strike "every reference to the [Wexler] declaration throughout NES's summary
judgment papers filed in this matter," as well the portions of Brown's declaration which refer to Wexler's
declaration.  Mot. Strike Wexler Decl. 2, 11–12.  Because the Court concludes there is no basis to strike Wexler's
declaration itself, the Court does not strike other filings which are allegedly "infected throughout with Dr. Wexler's
opinions."  *See id.* at 10.
[11] A federal employee need not "seek relief from his employing agency or the EEOC" and may instead "decide to
present the merits of his claim to a federal court in the first instance."  *Stevens v. Dep't of Treasury*, 500 U.S. 1, 5–6
(1991) (citing 29 U.S.C. § 633a).

701 F.3d 1158, 1159 (7th Cir. 2012) (Title VII); *see also Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 399–400 & n.2 (7th Cir. 2019) (describing differences between the administrative exhaustion requirements for the ADEA and Title VII).  The administrative charge is meant to "give[] the employer notice of the employee's grievances," so the civil action that stems from the administrative charge "must, at a minimum, describe the same conduct and implicate the same individuals."  *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831–32 (7th Cir. 2015).  However, "[c]ourts review the scope of an EEOC charge liberally," and "[t]o be cognizable in federal court, a [employment discrimination] claim must simply be like or reasonably related to the allegations of the charge and growing out of such allegations."  *Id.* at 831 (quotation marks omitted) (so holding in a Title VII case); *see also Reynolds v. Tangherlini*, 737 F.3d 1093, 1101–02 (7th Cir. 2013) (applying this standard to ADEA claims).

Additionally, there are time limits for filing an administrative charge.  "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice . . . ."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (citing 42 U.S.C. § 2000e-5(e)(1)).  Illinois is such a "deferral state," *see, e.g.*, *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014), such that a plaintiff's administrative charge before the EEOC "must be filed within 300 days of the unlawful [employment] practice," provided that the charge is also filed with the relevant state agency, *Wrolstad*, 911 F.3d at 456; *Begolli*, 701 F.3d at 1159; *see also Gilardi v. Schroeder*, 833 F.2d 1226, 1229–31 (7th Cir. 1987) (describing the operation of this rule for deferral states under both Title VII and the ADEA).

Deciding when an "unlawful employment practice" has "occurred" depends on whether the claim involves "discrete discriminatory acts [or] hostile work environment claims." *Morgan*, 536 U.S. at 110. "[T]ermination, failure to promote, denial of transfer, or refusal to hire" are discrete discriminatory acts, *id.* at 114, as are "[r]eassignment[s] of duties and suspensions," *Bass*, 746 F.3d at 840, and each paycheck, *Groesch v. City of Springfield*, 635 F.3d 1020, 1027 (7th Cir. 2011). For discrete acts, "the clock for th[e] limitations period commences when an employer communicates an adverse employment decision to the employee, not when the full consequences of that action are felt." *Wrolstad*, 911 F.3d at 456 (quotation marks omitted). "To start the limitations clock, however, the employer's decision must be final, ultimate, [and] non-tentative, and the employee must receive unequivocal notice of it." *Id.* (alteration in original) (quotation marks omitted). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113. Conversely, "[a] hostile work environment claim is administratively exhausted if 'all acts which constitute the claim are part of the same unlawful employment practice and *at least one* act falls within the time period.'" *Hambrick v. Kijakazi*, 79 F.4th 835, 841 (7th Cir. 2023) (quoting *Morgan*, 536 U.S. at 122).

Plaintiff's administrative charges were filed with the Illinois Department of Human Rights and EEOC against NES and GCH on September 12, 2019. *See* NES Charge of Discrimination, NES Mot. Summ. J. Ex. 3, ECF No. 35-4; GCH Charge of Discrimination, GCH Mot. Summ. J. Ex. 19, ECF No. 36-19. Thus, the operative date for the limitations period is 300 days prior—November 16, 2018. *See, e.g.*, *Wrolstad*, 911 F.3d at 456. Defendants argue that Plaintiff's claims that the number of shifts he was scheduled for was reduced, that he was

removed from the GCH ED schedule, and that he was subjected to a hostile work environment are time-barred and otherwise unexhausted.  NES Mot. Summ. J. 30–33.

### 1.  Number of Shifts

NES argues that Plaintiff's claim that he was assigned to fewer shifts at the end of 2018 is administratively barred as untimely and not within the scope of Plaintiff's administrative charges.  *Id.* at 30–31.  Initial monthly schedules for shifts were provided to physicians 60 to 90 days in advance.  *Id.* ¶ 27.  Three months are at issue: November 2018, December 2018, and January 2019.  Plaintiff received notice of his scheduled shifts for November 2018 and December 2018 by October 11, 2018, and those schedules did not change after November 5, 2018, and October 24, 2018, respectively.  *Id.* ¶¶ 29–30.  Similarly, as of November 15, 2018, Plaintiff had received notice that he had been removed from all his previously scheduled shifts in January 2019.  *Id.* ¶ 37; *see also* Schedule Change Documentation, NES Mot. Summ. J. Ex. 14, ECF No. 35-15 (showing that by November 14, 2018, Plaintiff had reviewed the automated notifications which informed him that he had been removed from the January 2019 schedule).

Plaintiff does not respond to NES's arguments regarding whether he exhausted claims related to the number of shifts he received in November and December 2018.  *See* Resp. NES Mot. Summ. J. 94–98; NES Reply Mot. Summ. J. 146, ECF No. 71 (noting Plaintiff's failure to respond).  Plaintiff states that "he knew his GCH ED scheduled dates for January, 2019 had been removed" by November 15, 2018.  Resp. NES Mot. Summ. J. 97 (emphasis removed) (citing Schedule Change Documentation).  He does not point to any evidence that would create a genuine dispute as to whether the schedule for January 2019 changed after November 15, 2018.  He also concedes that his administrative charges did not mention alleged discrimination with respect to the number of shifts he worked each month.  *Id.* at 2.  Like a suspension or paycheck,

each monthly schedule was a discrete act.  *Cf. Morgan*, 536 U.S. at 114; *Groesch*, 635 F.3d at

1027.  Therefore, the Court finds that claims of discrimination based on the number of shifts

Plaintiff was scheduled to work in November 2018, December 2018, and January 2019 were not

exhausted and that Plaintiff cannot seek relief based solely on those months' schedules.  *See*

*Morgan*, 536 U.S. at 113.

## 2.  Removal from GCH ED Schedule

NES argues that claims related to Plaintiff's complete removal from the GCH ED

schedule are unexhausted—and therefore barred—as untimely and unrelated to the

administrative charges' allegations.  NES Mot. Summ. J. 31.  Plaintiff disagrees that claims

based on his permanent removal from the ED schedule are untimely because the decisionmakers

themselves had not yet decided to permanently remove Plaintiff from the GCH ED schedule by

November 16, 2018, and because Plaintiff did not receive unequivocal notice of this removal

until January 3, 2019.  Resp. NES Mot. Summ. J. 95–98.  Plaintiff had received notice of his

complete removal from the January 2019 schedule by November 16, 2018, but viewing the facts

in the light most favorable to Plaintiff, as far as he knew this removal could have been just for

January and not subsequent months.  *See Wrolstad*, 911 F.3d at 456 ("[T]he employer's decision

must be final, ultimate, [and] non-tentative, and the employee must receive unequivocal notice of

it." (second alteration in original) (quotation marks omitted)).  Flynn's letter to NES—formally

requesting that Plaintiff be permanently removed from the GCH ED schedule—was not authored

until November 20, 2018.  *See* Nov. 20, 2018 Letter from James Flynn to Thomas Brown.

Plaintiff was not sent a copy of this letter until January 3, 2019.  *See* Jan. 3, 2019 Email from

Thomas Brown to Veerasikku Bommiasamy, Resp. NES Mot. Summ. J. Ex. P, ECF No. 67-16 at

3–4.  Claims based on Plaintiff's permanent removal from the GCH ED schedule are not barred

as untimely because Plaintiff did not receive unequivocal and final notice of NES's decision until January 3, 2019.[12]

However, Plaintiff fails to respond to NES's argument that claims based on his permanent removal from the GCH ED schedule are outside the scope of the administrative charges. *See* Resp. NES Mot. Summ. J. 95–98. Plaintiff concedes that his administrative charges did not make any allegations regarding his permanent removal from the GCH ED schedule, as opposed to termination of his services. Resp. NES Mot. Summ. J. 2; NES Reply Mot. Summ. J. 146. As "it is not [the Court's] responsibility to make the parties' arguments for them," *United States v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015), the Court finds that claims based solely on Plaintiff's permanent removal from the GCH ED schedule are unexhausted and therefore barred.

### 3. Hostile Work Environment Harassment

NES argues that Plaintiff's harassment claims—regarding a hostile work environment—are untimely and unexhausted. NES Mot. Summ. J. 31–33. Unlike the discrete employment practices discussed above, only one act which is a part of the allegedly unlawful employment practice need to have occurred after November 16, 2018, for this claim to be timely. *See* *Hambrick*, 79 F.4th at 841. NES notes that Plaintiff testified that Dr. Singel stopped making discriminatory remarks directed at Plaintiff by July 2018 or earlier. NES Mot. Summ. J. ¶ 120. Once again, Plaintiff does not respond to NES's arguments that this claim is untimely. Resp.

---

[12] NES points to handwritten correspondence from Plaintiff which states that he had "been terminated . . . as of Nov 15, 2018" to argue that Plaintiff had notice of his termination and permanent removal from the GCH ED schedule by November 15, 2018. *See* NES Mot. Summ. J. ¶ 38 (citing Jan. 28, 2019 Letter from Veerasikku Bommiasamy to Frank Peppers, NES Mot. Summ. J. Ex. 17, ECF No. 35-18). However, that handwritten correspondence is dated January 28, 2019, and Plaintiff avers that he "surmised, in hindsight, that the decision to eliminate and terminate [his] employment had been made by November 15, 2018." Pl. Decl. ¶ 133. At a minimum, there is a genuine dispute of material fact as to whether Plaintiff knew that he had been permanently removed from the GCH ED schedule and terminated by November 15, 2018, precluding a finding that claims based on his permanent removal from the GCH ED schedule or termination are barred as untimely.

NES Mot. Summ. J. 95–98; NES Reply Mot. Summ. J. 146.  Therefore, Plaintiff has failed to point to any timely allegations of harassment, such that his claim of discrimination based upon a hostile work environment is untimely and barred.

In sum, only claims related to Plaintiff's ultimate termination are exhausted and properly considered as part of the instant case.  Plaintiff's claims related to his permanent removal were timely, but his failure to allege in his EEOC charge that his permanent removal was discriminatory means that the claim is unexhausted and barred.  Plaintiff's arguments treat the permanent removal and ultimate termination as part of a continuing violation, but they are discrete acts and Plaintiff may only seek relief based on his ultimate termination.  *See Morgan*, 536 U.S. at 113 ("[The plaintiff] could not use a termination that fell within the limitations period to pull in the time-barred discriminatory act." (citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 257 (1980))).  Additionally, while viewing the facts in the light most favorable to Plaintiff, GCH's request to permanently remove Plaintiff from the GCH ED schedule contributed to his ultimate termination, GCH had no authority to terminate Plaintiff's physician agreement—that was NES's sole decision.  *See* Pl.'s Physician Agreement ¶ 1 ("[T]his Agreement *may* be terminated by the Corporation immediately . . . ." (emphasis added)); GCH Mot. Summ J. ¶ 54. Because Plaintiff has failed to show that GCH should be liable for NES's allegedly discriminatory exercise of its rights under the Plaintiff Physician Agreement, GCH's Motion for Summary Judgment is GRANTED.

### C.  Discriminatory Termination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Similarly,

26

the ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual [in the protected class] . . . because of such individual's age." 29 U.S.C. § 623(a)(1). To survive summary judgment on claims under either statute, a plaintiff must point to evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself . . . ." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

There is no question that Plaintiff—born in India and over the age of forty—has protected characteristics. *See* Resp. NES Mot. Summ. J. 59; *Johal v. Little Lady Foods, Inc.*, No. 02 C 8481, 2004 WL 1745749, at *13 (N.D. Ill. July 30, 2004) ("As a [person] born in India over the age of forty, [the plaintiff] falls into several protected classes: . . . age, national origin, and color."), *aff'd*, 434 F.3d 943 (7th Cir. 2006). He was terminated, which is indisputably an adverse employment action. *See, e.g.*, *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). NES argues that Plaintiff cannot succeed under either the holistic standard of *Ortiz* or the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See, e.g.*, NES Mot. Summ. J. 34–36. The *McDonell Douglas* framework is not as useful where, as here, the defendant relies upon performance problems as the legitimate, non-discriminatory reasons for the plaintiff's termination. *See Khungar*, 985 F.3d at 573. The Court proceeds straight to the *Ortiz* inquiry and considers whether there is sufficient evidence from which a jury could conclude that Plaintiff was illegally terminated because of his age, national origin, or both. *See Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) ("Because [the employer] has raised [the employee]'s performance as the reason for his termination, we need not consider [the

employee]'s prima facie case under *McDonell Douglas* or conduct a separate analysis of the facts under the two frameworks."); *Coleman*, 667 F.3d at 857 ("[C]omparator evidence is relevant at the pretext stage.").  Plaintiff argues that there is sufficient evidence because NES gave pretextual reasons for his termination and because similarly situated physicians were treated differently.  *E.g.*, Resp. NES Mot. Summ. J. 98–113.

## 1.  Treatment of Similarly Situated Employees

The inquiry for similarly situated employees was summarized in *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368–69 (7th Cir. 2019).  There, the Seventh Circuit stated:

> Although similarly situated employees need not be identical in every conceivable way, they must be directly comparable to the plaintiff in all material respects.  In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.  But this is not a hard and fast test, and there is no magic to these considerations.  In the employment discrimination context, the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence.  Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue.

*Id.*  (quotation marks omitted).  "The purpose of the similarly situated prong is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable – discriminatory animus." *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quotation marks omitted).

Plaintiff points to Drs. David W. Dean and Christopher M. Herman as his comparators. Resp. NES Mot. Summ. J. 111–13.  Both are white men over twenty years younger than Plaintiff, were born in the United States, speak without a "non-American . . . accent when

speaking English," and were already working at the GCH ED when NES entered into the

Staffing Agreement with GCH.  *Id.* at 112.  Both signed Physician Agreements with NES, which

the comparator doctors assert were similar to Plaintiff's Physician Agreement.  *See, e.g.*, *id.*

(citing Dean Decl. ¶¶ 4–5, Resp. NES Mot. Summ. J. Ex. N, ECF No. 67-14 ("In late 2017, I

signed a Physician Agreement and Addendum with NES similar to the Physician Agreement and

Addendum that [Plaintiff] signed with NES in late 2017 . . . .")).  All three were "supervised by

and reported to the same individuals, and w[ere] subject to the same standards, policies and

review structures and procedures."  *Id.*  Drs. Dean and Herman continued to work in the GCH

ED until the relevant Staffing Agreement ended, sometime after January 1, 2019.  *See* Dean

Decl. ¶ 8; Herman Decl. ¶ 6, Resp. NES Mot. Summ. J. Ex. O, ECF No. 67-15.  Both Drs. Dean

and Herman assert that they never experienced any form of discrimination, and that they were

excellent ED physicians, like Plaintiff.  *See* Dean Decl. ¶¶ 9–10; Herman Decl. ¶¶ 7–8.

Defendants state that Plaintiff has failed to adduce evidence of sufficient comparators.

*See* NES Mot. Summ. J. 37–38; GCH Mot. Summ. J. 22–24.  They argue that: (1) the

declarations of Drs. Dean and Herman are conclusory and therefore inadmissible as summary-

judgment evidence, NES Reply Mot. Summ. J. 142; and (2) the declarations fail to establish

"even one instance in which Drs. Dean or Herman engaged in conduct that NES considered

deficient, with respect to Plaintiff, without consequence, so Plaintiff's comparisons of himself to

Drs. Dean and Herman are entirely misplaced," *id.* at 143.  Plaintiff does not respond to the first

argument but argues without citation to any authority that the second argument is "misplaced, as

each of these 'difficulties' and 'concerns' was knowingly fabricated as pretexts for the removal

of Plaintiff."  Resp. NES Mot. Summ. J. 112.

"[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Burks v. Wis, Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006) (quotation marks omitted); *see also Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016) ("An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated."). Plaintiff does not even attempt to make a showing that Drs. Dean or Herman had similar scheduling requirements or that they engaged in any specific work-related misconduct, let alone conduct that is similar to what NES cites as the performance concerns that justified Plaintiff's termination.  Because neither physician "had a comparable set of failings," neither of them are "similarly situated." *Burks*, 464 F.3d at 752 (quotation marks omitted).

Plaintiff's perfunctory argument that NES's stated concerns were pretextual and therefore he need not point to comparable failings is unsupported and unpersuasive in light of cases like *Burks* and *Simpson*.  The point of the similarly situated prong is to "eliminate other possible explanatory variables," and Plaintiff does not provide any competent evidence as to the variable of work performance.  *See Marnocha*, 986 F.3d at 719 (quotation marks omitted).  Plaintiff has failed to adduce sufficient evidence of a similarly situated comparator.[13]

## 2. Performance and Pretext

Plaintiff must show that there is sufficient evidence to allow a reasonable jury to conclude that NES's cited legitimate, non-discriminatory reasons for his termination "are pretextual, meaning false, allowing an inference that the [Defendants'] true intent was

---

[13] Throughout his responses, Plaintiff also compares himself to Dr. Singel.  *See, e.g.*, Resp. NES Mot. Summ. J. 104 ("In other words, Dr. Singel himself was more consistently unavailable and more difficult to schedule that Plaintiff.").  "Ordinarily, a plaintiff is not similarly situated to another employee when the plaintiff is subordinate to that employee." *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 842 (N.D. Ill. 2017).  The Court finds that that are not "enough common factors to allow for a meaningful comparison," *see id.*, between Plaintiff and Dr. Singel because of the effect of Dr. Singel's administrative responsibilities on his scheduling and Plaintiff's lack of similar responsibilities, *see* Mott Decl. ¶ 17.

discriminatory." *Runkel v. City of Springfield*, 51 F.4th 736, 744 (7th Cir. 2022); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding that a showing of pretext "(particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .").  Defendants insist that showing pretext is not enough— Plaintiff must "also show that the explanations are a pretext for the prohibited animus."  NES Mot. Summ. J. 38 (quoting *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021)).  *But see Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017) ("Evidence that an employer lied about the reasons for an adverse employment action permits a trier of fact to infer that the decision was actually motivated by discriminatory animus.").

More recent decisions cast doubt on Defendants' assertion that pretext by itself is insufficient, absent some further showing of prohibited animus.  *See Runkel*, 51 F.4th at 745 n.3 (instructing that language in prior decisions which could suggest that "a showing of pretext requires a plaintiff to show the employer's non-discriminatory reason was dishonest, *and also* to show that the employer's true reason was discriminatory . . . . should not be interpreted to suggest that a plaintiff must show both pretext *and* some additional evidence of discrimination to permit the inference of unlawful intent").  "[A]n employer's dishonest explanation of a decision can, by itself, support an inference that its real reason was unlawful."  *Vichio v. US Foods, Inc.*, 88 F.4th 687, 695 (7th Cir. 2023) (quotation marks omitted).

Defendants point out that many of Plaintiff's arguments turn on his evaluation of his own performance.  *See, e.g.*, GCH Mot. Summ. J. 26.  For example, Plaintiff testified that he did not make any mistakes at GCH.  Pl. Dep. 126:4–127:6, NES Mot. Summ. J. Ex. 2, ECF No. 35-3;

*see also* Pl. Decl. ¶ 36, Resp. NES Mot. Summ. J. Ex. A, ECF No. 67-1 at 1–36 (asserting that prior to Dr. Singel's first shift at the GCH ED, he had never been criticized for how he handled patient's pain, as compared with any other physician); *id.* ¶¶ 95–104 (asserting that his handling of the ET tube incident was proper); *id.* ¶¶ 90–94 (asserting that the stress test incident was not his fault and instead the fault of the cardiac rehabilitation physician); *id.* ¶¶ 106–26 (asserting that he handled the code situations properly); *id.* ¶¶ 62–63 (asserting that any negative peer-review finding was wrong). In some circumstances, a plaintiff's assertion that his job performance was satisfactory can show that the plaintiff was meeting her employer's legitimate expectations. *See Oates v. Discovery Zone*, 116 F.3d 1161, 1171–72 (7th Cir. 1997).

But an employee's "own evaluation of his work cannot be imputed to [the employer], and is insufficient to permit his case to survive past summary judgment." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011); *see also Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 980 (7th Cir. 2004) ("An employee's self-evaluation cannot create an issue of fact about an employer's honest assessment of inadequate performance."). "In considering whether [Plaintiff] met [Defendants'] expectations, [t]he proper inquiry mandates looking at [Plaintiff's] job performance through the eyes of h[is] supervisors at the time. The question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest*." *Khungar*, 985 F.3d at 574 (third and last alteration in original) (quotation marks omitted).

Dr. Wexler and Brown aver that the legitimate, non-discriminatory reasons for the ultimate termination of Plaintiff's Physician agreement were the ET tube incident, the stress test incident, the two code situations, EMR issues, Plaintiff's scheduling difficulties, and the lack of

another open position for which Plaintiff was qualified at the time that he was removed from the GCH ED schedule.  Wexler Decl. ¶¶ 26–27; Brown Decl. ¶¶ 21–22; *see also* NES Mot. Summ. J. ¶¶ 46–49, 54–62, 71–73, 82.  Plaintiff makes a variety of evidentiary objections to these material facts, none of which have merit.  Resp. NES Mot. Summ. J. 25–26, 28–31, 34–37, 41–42.  For example, he objects to the assertion that Davis told Dr. Wexler and Brown about Plaintiff's EMR issues because "the source of any rumor that Plaintiff's need for help using EMR is not even identified," and that Davis's testimony constitutes hearsay and lacks foundation.  *See id.* at 24.

His foundation objection is meritless—Davis was Chief Nursing Officer, and "[e]mployment can provide the foundation for facts and perceptions relating to that employment," *Krnich*, 2021 WL 3930306, at *3; *see also* Cirimotich Dep. 128:10–16 (testifying that "the nurse leader and nurse director of the emergency department report[ed]" to Davis); Davis Dep. 15:5–10 (testifying that "the emergency department manager was my direct report, and she had I would guess about 25 staff of emergency nurses and technicians that reported to her"); *id.* at 15:20–16:3 (testifying that Mindy Ragon was GCH's emergency department manager); *id.* at 91:15–92:2 (testifying that "the ER director," Mindy Ragon "would have been" the person to bring to Davis's attention Plaintiff's issues with the EMR system).  Davis's position as CNO and GCH's reporting structure supplies the necessary foundation for this testimony.  The hearsay objection also misses the mark.  These statements are not used to prove the truth of Plaintiff's performance—that Plaintiff in fact struggled with the EMR system—but rather what the relevant decisionmakers believed when they decided to terminate Plaintiff.  *See, e.g.*, *Khungar*, 985 F.3d at 574.  Plaintiff attempts to create a dispute of material fact on this point by pointing to his affidavit, in which he asserts: "I have never needed nor requested help

from anyone using the EMR system, on which I am fully proficient."  Pl. Decl. ¶ 129.  To the

extent that Plaintiff attempts to create a dispute of fact regarding what Dr. Wexler and Brown

believed about Plaintiff's performance when NES terminated his Physician Agreement by

arguing that such statements are hearsay, lack foundation, are expert testimony, or do not align

with Plaintiff's evaluation of his own performance,[14] the Court rejects the argument and deems

the disputed fact to be admitted.

Plaintiff argues that NES's reasons are pretextual because Dr. Wexler and Brown failed

to take certain steps that Plaintiff thought would be necessary to justify his termination.  The

Court finds the Seventh Circuit's decision in *Khungar* to be informative.  *See id.* at 575–77.  The

Seventh Circuit considered and rejected the physician-plaintiff's attempts to undermine her

employer's arguments that her performance was unsatisfactory.  *Id.*  Specifically, the Seventh

Circuit rejected the plaintiff's arguments that: (1) complaints about her performance were

fabricated because "the complaints weren't brought to her attention" because the fact "[t]hat [the

plaintiff] wasn't informed of each complaint tells us only that; it does not mean they were

fictitious," *id.* at 575; (2) her termination was "unusual—and thus pretextual—because [the

employer] did not conduct an investigation into her conduct or follow its normal policy" because

there was no "policy or procedure for responding to patient complaints" and courts "do not tell

---

[14] Unlike Dr. Wexler's testimony, Plaintiff's affidavit's citations to medical treatises and journals to establish that his care in the ET tube incident was proper does constitute impermissible expert testimony because Plaintiff was not disclosed as an expert witness and this testimony is offered to prove the applicable standard of medical care and Plaintiff's non-deviation therefrom.  *Cf. Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002) (applying Illinois law to a medical malpractice claim and noting "expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard" (quotation marks omitted)).  Also, the purported statements of the patient's family members and other unidentified medical professionals involved in the patient's care are offered to prove the truth of the matters they assert, namely that others agreed with Plaintiff's decision to not extubate the patient, *see, e.g.*, Pl. Decl. ¶ 97 ("The ED manager in charge, the hospital-wide supervisor, the patient's primary care doctor (whom I called to consult), and myself together agreed with the decision not to extubate the patient when the ventilator was removed"), and are therefore impermissible hearsay.  The Court finds that these inadmissible assertions are not competent summary-judgment evidence.

employers how to discipline employees; rather, [they] ensure that the process is not discriminatory," *id.* at 576 (quotation marks omitted); and (3) the stated reasons for her termination—relating to a purported threat to destroy the employer's clinic—was pretextual because "even if [the court] assume[d] that [the plaintiff] never made a threating statement . . . [t]he undisputed evidence show[ed] that [an HR employee] had cause to believe that [the plaintiff] made a threatening statement," *id.* at 576–77 (quotation marks omitted). The Seventh Circuit also highlighted the testimony of the chief medical officer and health center manager "that they were merely putting together information for Human Resources in anticipation of invoking the ninety-day notice" which was required under the plaintiff's employment agreement. *Id.* at 570, 575.

Plaintiff advances many of the same arguments which were rejected in *Khungar*. He asserts that the ET tube incident and stress test were fabricated because they were not "peer reviewed or otherwise investigated," and "Brown, Dr. Wexler, and GCH's administration never sought to consult Plaintiff regarding either of the two clinical situations." Resp. NES Mot. Summ. J. 107. But Plaintiff has not adduced any evidence that GCH had a policy which required that physicians be contacted about complaints against them nor that such complaints always be referred to peer review. *See* NES Mot. Summ. J. ¶ 103. That Plaintiff was not informed of a complaint tells the Court only that, it does not mean that the complaint was fictitious. *See Khungar*, 985 F.3d at 575. Similarly, the lack of a policy regarding when—as opposed to how— a peer review must be conducted means that the lack of peer review or investigation into a given complaint does not tell the Court that an incident which was not peer reviewed must be fictitious or the product of pretext. *See id.* at 576. Finally, even if Plaintiff's conduct in the ET tube incident, stress test incident, and two code situations was indeed proper, the undisputed evidence

shows that the decisionmakers had descriptions of Plaintiff's performance—which they had cause to believe was deficient—before them when they decided to terminate Plaintiff. *See id.*

Attempting to show that Cirimotich's reasoning was pretextual, Plaintiff highlights that "Cirimotich was purely an administrative nurse, not a physician capable of understanding and reviewing Plaintiff's performance in complex 'code' situations." Resp. NES Mot. Summ. J. 109. He points to GCH's interrogatory responses—which stated that "the Chief Quality Officer would not have managed, evaluated, or otherwise supervised Plaintiff (who was an independent contractor) or evaluated the performance of his work," GCH Interrog. Resp. 11—and argues this "hallmarks her 'code' narratives as pretextual," Resp. NES Mot. Summ. J. 108–09. But that same interrogatory response noted that Cirimotich might "have general information concerning quality concerns," GCH Interrog. Resp. 11, and there is no evidence that any decisionmakers had reason to doubt her competency to observe and record her observations. Similarly, Cirimotich made her observations at the end of October—her October 31, 2018 email states that the code incidents occurred over "the past 2 days," *see* Oct. 31, 2018 Email from Cassie Cirimotich to Thomas Brown—after Cirimotich met with Brown, Dr. Wexler, Davis, and Flynn on October 23 and Dr. Wexler told her to write down her clinical concerns about Plaintiff. But compiling a record to justify termination is not itself a discriminatory act. *Cf. Khungar*, 985 F.3d at 575.

Plaintiff points to Dr. Singel's role in Plaintiff's ultimate termination—he allegedly oversaw scheduling, he sat on certain peer review committees that judged Plaintiff's work, he relayed the ET tube and stress incidents to Dr. Wexler and Brown, and he recommended that Plaintiff be terminated. *See, e.g.*, Resp. NES Mot. Summ. J. 105. Plaintiff does not argue that Dr. Singel was the ultimate decisionmaker for NES and—although not described as such—his theory of liability is essentially the "cat's paw" theory. *See Simpson v. Beaver Dam Cmty.*

36

*Hosps., Inc.*, 780 F.3d 784, 797–98 (7th Cir. 2015). To succeed on a cat's paw theory, "the plaintiff must present evidence that the biased subordinate actually harbored discriminatory animus against him and that the subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (quotation marks omitted). The theory requires Plaintiff to show that Dr. Singel "was motivated by discriminatory animus and falsely reported his behavior" to Dr. Wexler, Brown, or both. *Simpson*, 780 F.3d at 798. He would also need "to raise an issue as to pretext for each proffered concern to withstand summary judgment." *Id.* "An employer may avoid cat's-paw liability if the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Sinha*, 995 F.3d at 574 (quotation marks omitted).

To the extent that Dr. Singel's threatening comments, which ended in July 2018, are not stray remarks, *see Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 934–35 (7th Cir. 2020); *Almblade v. Wormuth*, No. 4:20-cv-04196-SLD-JEH, 2021 WL 4341931, at *7 (C.D. Ill. Sept. 23, 2021), no reasonable jury could find for Plaintiff on a cat's paw basis because Dr. Singel was not involved in each basis that was identified for Plaintiff's ultimate termination. There is at least a genuine dispute of material fact as to whether Dr. Singel exercised control over scheduling. *See* Dec. 6, 2019 Letter from Rachel Wright to Julie Bretz, US EEOC 2; Singel Physician Agreement 9; Mar. 27, 2018 Email from Heather Mott to Veerasikku Bommiasamy; Davis Dep. 95:16–18. However, Plaintiff has not sufficiently supported his assertion that "[b]ecause Dr. Singel was in charge of the ED scheduling, this complaint [about Plaintiff's scheduling difficulties] necessarily came from him." Resp. NES Mot. Summ. J. 102. The scheduling complaints—which remain valid despite Plaintiff's willingness to work shifts that

met his parameter of only day-shifts—are just as likely to have come from Mott or recruiters like

Kirkland.  *See* Wexler Decl. ¶ 25 ("[T]he physicians wanted a balance of day and overnight

shifts—and physicians were generally unwilling to work only overnight shifts."); *id.*

("Accommodating [Plaintiff]'s demands to only work day shifts made it harder to recruit and

retain physicians . . . . [Plaintiff]'s refusal to work night shifts was a problem for NES beyond the

simple fact of [Plaintiff]'s refusal to work at least half of the shifts each month."); *see also* Mott

Decl ¶¶ 16, 22.  Plaintiff "is not entitled to the benefit of inferences that are supported only by

speculation or conjecture."  *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).  More simply,

Dr. Singel was not involved in the reporting of the two code narratives and the EMR issues.[15]

Because Plaintiff cannot "raise an issue as to pretext for each proffered concern," he cannot

"withstand summary judgment" on this theory of liability.  *See Simpson*, 780 F.3d at 798.

All that is left is the suspicious timeline.  *See* Resp. NES Mot. Summ. J. 106–07.  The ET

tube incident, stress test incident, and code narratives were only surfaced after the

decisionmakers had already met twice to discuss Plaintiff's termination.  A reasonable jury might

be tempted to find this suspicious and a sign that Plaintiff's "termination seemed to be

predetermined."  *See Vichio*, 88 F.4th at 692.  However, some concerns predated the meetings

that precipitated Plaintiff's removal from the GCH ED schedule, such as the EMR issues, his

speed, and his overall effectiveness.  It would be unreasonable for a jury to infer discriminatory

intent from the act of documenting existing concerns in anticipation of justifying a termination.

*Cf. Khungar*, 985 F.3d at 575.  Without more compelling and competent circumstantial evidence,

---

[15] One of the code narratives references states that Plaintiff "had to be retrieved by the director of the ED," Brown's Notes 6, which Plaintiff interprets to be Dr. Singel, *see* Resp. NES Mot. Summ. J. 89–90.  He disputes that Dr. Singel could have been there, based on the relevant GCH ED schedule.  *Id.*  This ignores Dr. Singel's administrative and supervisory responsibilities but is ultimately immaterial as it does not affect the first code narrative, which Dr. Wexler thought also demonstrated poor leadership and provided a reason to terminate Plaintiff.  *See* Wexler Decl. ¶ 17.

Plaintiff cannot convince a reasonable jury that NES's decisionmakers did not honestly believe that their stated reasons for terminating Plaintiff's Physician Agreement were legitimate, non-discriminatory reasons.

## CONCLUSION

Accordingly, NES's Combined Motion and Memorandum of Law in Support of Summary Judgment, ECF No. 35, is GRANTED, GCH's Motion for Summary Judgment, ECF No. 36, is GRANTED, and Plaintiff's Motion to Strike Opinions and Hearsay in Declaration of Steven Wexler, M.D. and All References Thereto in NES's Summary Judgment Papers, and for the Imposition of Rule 37(c)(1) Sanctions, ECF No. 41, is DENIED.  The Clerk is directed to enter judgment and close the case.

Entered this 29th day of March, 2024.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE